UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TIMOTHY I.,                              )
                                         )
          Plaintiff,                     )
                                         )
     vs.                                 )          Case No. 4:17 CV 2678 (JMB)
                                         )
NANCY A. BERRYHILL,                      )
Deputy Commissioner of Operations,       )
Social Security Administration,          )
                                         )
          Defendant.                     )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security

Administration.  The parties have consented to the jurisdiction of the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On April 18, 2014, plaintiff Timothy I. protectively filed applications for disability

insurance benefits, Title  II, 42 U.S.C. §§ 401 *et seq*., and supplemental security income, Title

XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of April 6, 2014.  (Tr. 175-80, 181-

87; see also Tr. 22, 83, 93).  After plaintiff's applications were denied on initial consideration

(Tr. 105-09), he requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 112-14).

Plaintiff and counsel appeared for a hearing on July 13, 2016.  (Tr. 39-82).  Plaintiff

testified concerning his disability, daily activities, functional limitations, and past work.  The

ALJ also received testimony from vocational expert Michael McKeeman, Ph.D.  The ALJ issued

a decision denying plaintiff's applications on November 22, 2016.  (Tr. 22-38).  The Appeals

Council denied plaintiff's request for review on September 15, 2017. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability and Function Reports and Hearing Testimony

Plaintiff, who was born on March 19, 1972, was 42 years old on the alleged onset date. He completed the eighth grade and later earned a GED. (Tr. 46). He never obtained a driver's license. (Tr. 45, 47-48). At the time of the hearing, he was married and living with his wife and seven-year-old daughter; he also had an eighteen-year-old son. (Tr. 45). He received medical insurance in March 2016. (Tr. 54). Plaintiff had worked as a cook, a janitor, and a bill collector, and had packed boxes at a factory. (Tr. 48, 67-68, 70-72, 74-75, 195-96).

Plaintiff listed his impairments as diabetic neuropathy, cirrhosis of the liver, and depression. (Tr. 209). He was prescribed medications for the treatment of neuropathy, depression and anxiety, poor sleep, sciatic nerve pain, stomach pain and diarrhea, and reduced liver function.[1] He also took ibuprofen for back pain. (Tr. 283).

In his June 2014 function report, (Tr. 220-27), plaintiff reported that he stayed at home with his young daughter while her mother went to work. He prepared simple meals, did laundry, and tried to keep the kitchen and bathroom clean. He complained of shortness of breath, dizziness, and stabbing or shooting pain in his legs, especially at night. His sleep was interrupted by pain, night sweats, and the need to use the restroom. He had frequent swelling in his legs and it was hard to bend to put on shoes and socks. He reported that he had no energy and frequently had to sit. He could lift up to 20 pounds and stand for up to 30 minutes. He stated that sitting

---

[1] Plaintiff listed the following medications: gabapentin, sertraline, trazadone, prednisone, omeprazole, Imodium, and Liverite. (Tr. 283).

made his legs numb, but did not say how long he could sit. He was unable to go out alone because he had a tendency to stumble and fall. He did grocery shopping twice a month and went to medical appointments. He was able to follow written and spoken instructions but provided no information regarding his ability to concentrate. Although he got along with others without difficulty, his inability to stand, walk or drink alcohol kept him from socializing much. Plaintiff had difficulties with lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, memory, completing tasks, and concentrating.

Tyeshia Beans, the mother of plaintiff's daughter, completed a third-party function report in June 2014.[2] (Tr. 234-41). She had known plaintiff for more than 10 years. According to Ms. Beans, plaintiff had constant pain in his legs and feet and was depressed by his loss of mobility and independence, as well as the lifestyle changes imposed by his liver disease. Plaintiff was unable to stand for ten minutes and fell frequently due to the numbness in his legs and feet. It took him longer to perform self-care tasks. The pain also interfered with his sleep. His memory was impaired by his liver disease and she needed to remind him to take his medicine. Plaintiff's daily activities consisted of watching television and supervising his five-year-old daughter, with some help from the child's grandfather. Plaintiff prepared simple foods and did light housework, such as dusting. Their daughter had to take on some responsibility, such as picking things up and putting them away. (Tr. 241).

Plaintiff testified that he was unable to work due to back pain, numbness in his feet, bad knees, and poor stamina. (Tr. 48). He said that he had neuropathy that caused numbness and "electric shooting" in his hands and feet. Starting in January 2015, he noticed that his balance

---

[2] The couple married in November 2015. (Tr. 53).

was off and his feet dragged when he walked. His symptoms had increased over time and he was unable to walk much more than a block before he needed to rest. (Tr. 48-49). He took medication for neuropathy but it did not provide relief. (Tr. 49). In 2014, plaintiff was hospitalized for acute colitis, from which he still suffered. He had constant stomach aches and needed to use the bathroom frequently. (Tr. 50, 53). At the time of the hearing, plaintiff weighed 127 pounds. He usually weighed around 133 pounds and had weighed as much as 147 at times. (Tr. 46).

Plaintiff testified that he had suffered from depression since he was a small child and had been hospitalized multiple times for feeling suicidal. (Tr. 55-56). He said that he felt unable to talk to people and was afraid to leave the house. At the time of the hearing, plaintiff's medications included trazadone for sleep and Zoloft for depression and anxiety. (Tr. 55). Plaintiff testified that he had received treatment for his mental impairments from the Crider Health Center, until he got insurance and his copay rose to a level he was unable to afford. (Tr. 53). He also suffered from alcoholism. He stated that he started attending Alcoholics Anonymous on a daily basis about 10 days before the hearing. (Tr. 56-57). He previously had a 90-day period of abstinence following a two-week hospitalization[3] in September 2014. (Tr. 58). He said that during that period he felt the happiest he had ever been, both physically and mentally. (Tr. 59).

Plaintiff testified that he typically went to bed at 4:00 in the morning and slept for one to two hours. His wife worked from home and cooked most of the meals. (Tr. 60-61, 66). Plaintiff washed dishes and did some laundry. Prior to January 2016, he had been able to clean the floors

---

[3] According to medical records from the hospital, plaintiff was admitted on September 11, 2014, and was discharged on September 15, 2014. (Tr. 351-64).

about once a week, but was no longer able to do so.  (Tr. 63).  He and his daughter used the computer and read together.  Although he could lift up to 15 pounds, he could not carry that much weight.  (Tr. 50).

Vocational expert Michael McKeeman was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education and work experience who was limited to the full range of sedentary work, who could never use foot controls, could occasionally climb ramps and stairs, occasionally kneel and crouch, never crawl, and could never be exposed to certain environmental hazards.   (Tr. 77-78).  According to Dr. McKeeman, such an individual would be able to perform plaintiff's past work as a collection clerk, in addition to other work that was available in the national economy, such as cutter/paster, receptionist/ information clerk, and charge account clerk.  (Tr. 78-79).  Dr. McKeeman testified that the same employment opportunities would be available if the individual also needed to stand up for one to three minutes after each hour of sitting.  Further limiting the individual to performing only simple routine tasks and making only simple work decisions eliminated plaintiff's past work as a collection clerk but the other jobs remained available.  (Tr. 80).  Finally, no work in the national economy would be available to an individual whose severe pain and mental impairments prevented him from maintaining sufficient concentration, persistence, and pace to perform simple routine tasks on a sustained basis for a 40-hour work week.  (Tr. 80-81).

### B.    Medical Evidence

During the period under review, plaintiff had four hospital admissions for suicidal ideation and one admission for abdominal pain.  He also had multiple visits to the emergency department for physical complaints.  In addition, plaintiff had three office visits with a primary

care physician and three medication management appointments with a psychiatrist. The record does not include evidence of ongoing treatment for or a consultative evaluation of mental impairments.

Plaintiff received treatment from the Lincoln County Medical Center emergency department for a swollen toe in May 2013 and for migraine headaches in September and October 2013. (Tr. 309-10; 307-08; 328-29).

On April 7, 2014, plaintiff was admitted to the Lincoln County Medical Center intensive care unit after presenting to the emergency department with complaints of weakness, abdominal pain, and swelling in his legs, with occasional difficulty breathing. (Tr. 303-05; 313-15). He reported that he had lost 20 pounds in the last several months. On examination, he had edema in his legs, moderate wheezing throughout his chest, and a distended abdomen with tenderness on palpation. Blood work showed low hemoglobin and hematocrit, low potassium, elevated blood alcohol levels, and elevated enzyme levels consistent with liver disease. A CT scan of the abdomen and pelvis showed marked hepatic stenosis and multiple hypodensities in the liver, indicative of severe fatty infiltration or lesions. He also had a moderate amount of ascites[4] and thickening throughout the colon suggestive of colitis. (Tr. 313, 311). He was diagnosed with possible alcoholic hepatitis or cirrhosis and colitis. His condition improved with treatment with infusions, intravenous fluids, and medication. The record does not include a discharge summary, but he appears to have been admitted through at least April 11, 2014. See Tr. 320 (imaging done on April 24, 2014).

---

[4] Ascites is the accumulation of protein-containing fluid within the abdomen, commonly caused by high blood pressure in the veins that bring blood to the liver due to cirrhosis. https://www.merckmanuals.com/home/liver-and-gallbladder-disorders/manifestations-of-liver-disease/ascites (last visited on Sept. 19, 2018).

Plaintiff next received medical care on May 17, 2014, when he presented to the emergency department with chronic pain in his legs due to peripheral neuropathy and a laceration to the mouth. (Tr. 301-02). He was also intoxicated. He reported that he took Naprosyn to treat pain because he could not afford other medications. He explained that his primary care physician fired him for missing appointments. On examination, he was noted to be very thin and appeared intoxicated. He had a burning sensation in a stocking distribution from the knees down, but no tenderness on palpation. His motor exam, gait, and stance were all normal. He was discharged with instructions to follow up at the Crider Health Center.

Plaintiff started treatment with Richard Buckles, D.O., at the Crider Health Center on June 16, 2014. (Tr. 345-49). Plaintiff reported that he was not drinking at present and had gained a small amount of weight. He also reported that he felt depressed. He had significant neuropathic symptoms in his legs, which he thought was due to diabetes. Dr. Buckles clarified for plaintiff that he did not have diabetes and that his neuropathy was due to his drinking. On examination, plaintiff did not have any abdominal tenderness, hepatic enlargement, or edema. He was fully oriented and presented with appropriate mood and affect. Dr. Buckles advised plaintiff to discontinue all alcohol use and prescribed gabapentin to treat his neuropathy.

On August 9, 2014, plaintiff sought emergency treatment for a fracture to his right fist obtained when he hit the bottom of his fist on a table. (Tr. 389-90). The results of his physical examination were otherwise unremarkable. He was provided with pain medication and discharged.

On September 10, 2014, plaintiff was admitted to the inpatient psychiatric unit at University Hospital. (Tr. 351-66, 387-88). He reported that he was depressed and had decided

to end his life by overdosing on pills or alcohol.  He drank a fifth of vodka before going to the

emergency department.  He reported that he had suffered from depression since his childhood

and had been hospitalized for short periods on several occasions.  He never received significant

treatment or medication.  He reported that he typically had weekly episodes of depression but

recently he felt sad on a constant basis and experienced crying spells.  He also had neuropathy

which caused numbness and tingling in his extremities and hindered him from working as a

cook.  He stated that he stopped drinking after he was diagnosed with cirrhosis in April 2014 but

recently relapsed.  Plaintiff had decreased appetite and sleep, feelings of guilt and worthlessness,

and excessive nervousness and worry, with poor concentration, restlessness and irritability.

Plaintiff also suffered from social anxiety and reported that he became overwhelmed in situations

when other people were present.  On examination, he was oriented, with normal speech patterns,

and adequate attention and concentration.  His mood was depressed while his affect was flat and

congruent with his mood.  He had limited insight and judgment.  On September 15, 2014,

plaintiff was found to be stable and no longer a danger to himself and he was discharged.  (Tr.

356-57).  His diagnoses at discharge were major depressive disorder, chronic, severe, without

psychotic features; anxiety disorder, not otherwise specified; alcohol dependence; and cannabis

abuse.  His Global Assessment of Functioning (GAF) score was 35[5] at admission and 50[6] on

---

[5] A GAF of 31-40 corresponds with "some impairment in reality testing or communication . . . OR  major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[6] A GAF of 41-50 corresponds with "serious symptoms  (e.g.. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.

discharge.  He was prescribed Prozac to treat depression and naltrexone to treat cravings for alcohol.  (Tr. 357).

Rachel Kerr, M.S.W., of the Crider Health Center, completed a mental health assessment on November 3, 2014.  (Tr. 421-36).  Plaintiff reported that he recently began to feel down again and was frightened by his symptoms.  He had prior suicide attempts at ages 15 and 21, when his daughter was born five years earlier, and twice in the past year.  He had been alcohol free for 60 days.  Plaintiff's mood was sad and irritable and he had feelings of hopelessness, helplessness, and low self-worth.  (Tr. 417).  It appears that he did not begin outpatient treatment until January 29, 2015.

On January 8, 2015, plaintiff presented to St. Joseph Hospital in Wentzville with suicidal ideation.  (Tr. 369-74).  He was noted to have some depression and underlying anxiety, which were chronic in nature and exacerbated by alcohol use and family stress.  (Tr. 369).  He had not been taking his Prozac for the last two months and was drinking vodka every day.  (Tr. 369, 371).  He was admitted for inpatient treatment for alcoholism and depression and was started on Prozac and naltrexone.  He was discharged against medical advice the following day, with a diagnosis of alcoholism and a GAF of 46 to 50.  (Tr. 374; 376).

Plaintiff was readmitted to St. Joseph Hospital on January 20, 2015, after expressing suicidal ideation in a call to a hotline.  (Tr. 376-80).  He had not taken medication since December 2014 and was increasingly anxious.  He continued to drink.  His GAF at admission was 26 to 30.  At discharge on January 22, 2015, his diagnoses were major depression and alcohol abuse, with a GAF of 46 to 50.  It was noted that his depression and anxiety had stabilized and he was not suicidal.  He continued to have difficulty with stress management.

Psychiatrist David Goldmeier, M.D., of the Crider Health Center, completed a psychiatric evaluation of plaintiff on January 29, 2015. (Tr. 413-15). Plaintiff reported that he had depression "most of his life," with chronic anxiety and a history of panic attacks, although he had not had any "in a while." (Tr. 413). He reported that he had consumed one beer the day before the evaluation and that his last prior use was a week earlier. He described his mood as depressed, anxious, and irritable. He slept two to three hours a night. His energy and appetite were low and his concentration and level of interest were fair. He was not presently suicidal. His medications were gabapentin, trazodone, and Prozac; he had run out of naltrexone two months earlier. On mental status examination, plaintiff was polite and cooperative, with good eye contact. His mood was depressed and his affect was slightly decreased, slightly irritable, and slightly anxious. Plaintiff presented no psychomotor or speech abnormalities and his thoughts were logical and goal directed, and without any signs of psychosis. He had positive future plans and outlook that mitigated suicidal intent. His insight and judgment were fair. Dr. Goldmeier diagnosed plaintiff with major depression, recurrent; generalized anxiety disorder; alcohol dependence; and marijuana abuse. His GAF score was 42 at the present time and his high GAF within the prior year was 44. Dr. Goldmeier prescribed 40 mg of Prozac and 150 mg of trazodone, with naltrexone to be considered, depending on the results of his liver function tests.

Plaintiff returned to Dr. Goldmeier for medication management on February 20, 2015. (Tr. 408-12). Plaintiff reported he was only taking 20 mg of Prozac and 50 to 100 mg of trazadone. His mood was low at times and fair at others, with low concentration and energy. He did not have suicidal ideation. He slept four hours a night and his appetite was improving. He was drinking six "low alcohol" beers a day. He complained of knee and shin pain, but Dr.

Goldmeier did not note any abnormality of his gait and station. On mental status examination, plaintiff presented with fair grooming and eye contact, and was cooperative with appropriate behavior. He was oriented, but his attention and concentration were impaired. His mood and affect were depressed. His speech, thought processes, and thought content were all intact. His judgment and insight were fair. Dr. Goldmeier diagnosed plaintiff with major depressive disorder, recurrent, severe, without psychotic features; generalized anxiety disorder; and alcohol abuse, with moderate exacerbation of the depression and anxiety, and mild exacerbation of the alcohol abuse. Plaintiff was instructed to increase his Prozac to 40 mg and his trazadone to 150 mg. Plaintiff's GAF score was 42.

On February 23, 2015, primary care physician Dr. Buckles noted that plaintiff had neuropathy pain "all over, mostly in his legs." (Tr. 438-39). Dr. Buckles diagnosed plaintiff with mononeuritis of unspecified site and prescribed an increased dose of gabapentin.

On June 5, 2015, plaintiff sought emergency treatment for bilateral knee pain and shooting pain down his buttocks from his back. (Tr. 384-86). He was out of his medications and was drinking vodka "frequently." The examining physician described plaintiff as well appearing and not in apparent distress, although he was also described as cachectic. His physical examination was unremarkable with the exception of radiating pain into both thighs and hypertrophic changes to the knees and degenerative joint disease changes to the fingers and base of thumbs. He had normal ranges of motion, intact pulses, and no edema. His mood, manner, and grooming were all appropriate. He was prescribed prednisone, Ultram and gabapentin and was directed to follow up with his primary care physician.

Plaintiff had two medical appointments on August 18, 2015. He told Dr. Buckles that he had neuropathy pain and restless legs syndrome. (Tr. 440-42). Dr. Buckles did not note any abnormalities with the exception of blood tests which showed low levels of thyroid stimulating hormone. (Tr. 441, 443). Dr. Buckles refilled plaintiff's prescription for gabapentin and prescribed a trial of medication for plaintiff's restless legs syndrome. That same day, plaintiff told Dr. Goldmeier that his condition had worsened since his last appointment. (Tr. 403-07). He said that he did not think Prozac or trazadone worked very well and he had not taken either for four months. He reported that his last alcohol use was three weeks earlier. He was sleeping about one hour a day and reported low appetite, low energy, low concentration, and decreased interest. He also had crying spells. He complained of back and knee pain with motor restlessness. On mental status examination, plaintiff presented with fair grooming and eye contact, and was cooperative with appropriate behavior. He was oriented, but his attention and concentration were impaired. His mood was depressed and his affect was depressed and anxious. His speech, thought processes, and thought content were all intact. His judgment and insight were fair. He was not suicidal. Dr. Goldmeier discontinued Prozac and substituted Zoloft. He again instructed plaintiff increase his Trazadone to 150 mg. Plaintiff's conditions were all moderately exacerbated and his GAF score was 42.

There are no records of further medical treatment until January 24, 2016, when plaintiff sought emergency treatment for peripheral neuropathy and acute alcohol intoxication. (Tr. 382-83). He reported that his neuropathy was getting worse and he thought he had fibromyalgia. On examination, plaintiff had no pain or edema of the joints and normal ranges of motion. At

discharge, plaintiff reported that he was feeling much better and promised to drink less alcohol. He was given prescriptions for gabapentin and vitamin B1.

There is another gap in the medical record until June 28, 2016, when plaintiff went to the emergency department with lower abdominal pain, which he rated at level 8 on a 10-point scale. (Tr. 450-57). He also complained of insomnia and neuropathic pain in his legs and feet. On examination, he was visibly uncomfortable and held his left lower quadrant, which displayed tenderness and distention. After some vacillation, plaintiff declined inpatient admission for further treatment and was discharged against medical advice. He rated his pain at discharge at level 6.

On November 2, 2016, plaintiff was admitted for inpatient treatment for suicidality and depression. (Tr. 474-78). He claimed to have been sober from alcohol for four months. He complained of depressed feelings, low interests, low energy, and poor sleep. He was amenable to resuming his medications. He presented with depressed mood and flat affect and his speech and thought processes were unremarkable, while his insight was fair and his judgment poor. Inpatient treatment with Abilify and citalopram for depression and trazadone for sleep stabilized his condition and he was discharged on November 7, 2016. (Tr. 479-80). His diagnoses at discharge were depressive disorder, alcohol use disorder, tobacco use disorder, and GERD. These records were not submitted to the ALJ before the November 28, 2016, decision issued in this case. Plaintiff asserts, however — and defendant does not contest — that counsel for plaintiff provided these records to the Appeals Council on March 17, 2017. See Tr. 291 (correspondence from counsel citing enclosed records for additional treatment). The Appeals

Council acknowledged that it received counsel's correspondence but did not list the medical records among those materials it reviewed. (Tr. 4).

## 2. Opinion evidence

On July 16, 2014, State agency consultant Kyle DeVore, Ph.D., completed a Psychiatric Review Technique form. (Tr. 86-87, 96-97). Dr. DeVore concluded that plaintiff did not have a medically determinable impairment in the affective disorder category (listing 12.04). Dr. DeVore further found that plaintiff had only mild restrictions in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace. He had no repeated episodes of decompensation of extended duration. In support of his findings, Dr. DeVore noted that plaintiff did not take any medication and his mental status examinations were unremarkable for significant limitations. The ALJ gave Dr. DeVore's opinion only "some" weight, because Dr. DeVore had not examined plaintiff and that more recent medical treatment established that plaintiff's depression was a severe impairment. (Tr. 27-28).

Neurologist Riaz A. Naseer, M.D., completed a post-hearing consultative evaluation on September 1, 2016. (Tr. 458-60). Plaintiff reported that he had numbness in his feet, shooting pains in his legs, and frequent bowel movements. His medications included ropinirole for the treatment of restless legs syndrome, gabapentin, prednisone, the antidepressant sertraline, and trazadone. On examination, plaintiff was awake, alert, cooperative, and not in obvious acute distress. He walked to the office independently but rather slowly and had difficulties getting on and off the examination table. He was able to sit in a chair without truncal instability and was able to get out of the chair. He had difficulty standing on his heels and on his toes, was unable to

walk in tandem gait, and had "strongly positive" Romberg's sign[7] both with his eyes opened and with his eyes closed. He had symmetrical strength, but sluggish deep tendon reflexes and decreased pinprick and vibratory sensation in his lower legs. He was able to carry on conversation, correctly identify the current and past presidents, and complete simple calculations. Dr. Naseer's clinical impression was neuropathy, likely related to alcohol consumption, and cirrhosis of the liver. Dr. Naseer concluded that plaintiff was able to sit and handle small objects, but would have difficulty standing, walking, lifting, and carrying.

Dr. Naseer also completed a Medical Source Statement of ability to do work-related activities. (Tr. 462-67). He opined that plaintiff could occasionally lift and carry up to 10 pounds but could never manage any heavier weight. He could sit up to two hours at a time and up to six hours in an eight-hour day, while his capacity to stand or walk were each limited to one hour, total, in a day. He required a cane to walk more than 100 feet and could carry small objects in his free hand. He could occasionally operate foot controls and use his hands to handle, finger and feel. He was able to frequently reach and push or pull. He could never climb ramps, ladders, stairs, or scaffolds and only occasionally stoop, kneel, crouch, or crawl. He was restricted from unprotected heights, moving parts, and operating a vehicle and needed a quiet environment. He was able to shop, travel alone, ambulate without wheelchair or walker, use public transport, climb a few steps, feed himself, care for his personal hygiene, and manage paper and files. He was unable to walk at a reasonable pace on a rough surface. The ALJ gave

_____

[7] Romberg's sign "is the inability to stand (feet together or slightly less than shoulder width apart) without becoming unsteady, swaying, or falling over." Grebenick v. Chater, 121 F.3d 1193, 1196 n.3 (8th Cir. 1997). A positive Romberg's sign when the eyes are open is a sign of proprioception loss. Stedman's Med. Dict. 1771 (28th ed. 2006).

Dr. Naseer's opinion partial weight. (Tr. 30). In particular, the ALJ took issue with Dr. Naseer's assertion that plaintiff required a cane because there was no evidence that plaintiff had ever used or been prescribed a cane. The ALJ also rejected Dr. Naseer's opinion that plaintiff was limited to lifting no more than 10 pounds or using his arms to reach,[8] could tolerate only occasional exposure to humidity and dust, and required a quiet atmosphere.

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) he is not currently engaged

---

[8] The ALJ's characterization of the limitation on reaching as "significant" is puzzling because Dr. Naseer stated that plaintiff was capable of using his arms to reach in all directions up to 2/3 of the time, rather than continuously. (Tr. 464).

16

in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining

whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above.  The ALJ found that plaintiff had not engaged in substantial gainful activity since April 6, 2014, the alleged onset date.  (Tr. 24).  At steps two and three, the ALJ found that plaintiff had severe impairments of depression, anxiety, alcohol abuse, and peripheral neuropathy.  In addition, the ALJ found that plaintiff did not have a medically determinable impairment of a spinal disorder and that his cirrhosis and colitis were non-severe.  Id.  The ALJ analyzed plaintiff's eligibility for Listings 11.14 (peripheral neuropathy), addressed below, 12.04 (affective disorders), and 12.06 (anxiety and obsessive-compulsive disorders), and determined that he did not have an impairment or combination of impairments that meets or medically equals the listing requirements.[9]  Id. at 25-27.

The ALJ next determined that plaintiff had the RFC to occasionally lift or carry 10 pounds and frequently lift or carry less than 10 pounds; sit for six hours with the ability to alternate to standing for one to three minutes after every hour of sitting; stand for two hours; and walk for two hours; push or pull "as much as he lifts and carries;" and never operate foot controls.  In addition, plaintiff was able to occasionally climb stairs and ramps, stoop, kneel, and crouch, but never climb ladders, ropes, or scaffolds, and never balance or crawl.  He had to avoid workplace hazards and could not operate a motor vehicle.  Finally, he was limited to performing simple, repetitive tasks.  (Tr. 28).

---

[9] In analyzing the "paragraph B" criteria for Listings 12.04 and 12.06, the ALJ found that plaintiff had mild restrictions in his activities of daily living and social functioning; and moderate difficulties in maintaining concentration, persistence, and pace.  (Tr. 26).  Plaintiff had not had episodes of decompensation of extended duration.  Id.  Plaintiff also did not meet the "paragraph C" criteria.  Id. at 27.

In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as the statements of plaintiff and his wife regarding his abilities, conditions, and activities of daily living. With respect to plaintiff's mental impairments, the ALJ addressed plaintiff's GAF scores, recognizing that the scores are medical opinions as defined by 20 C.F.R. § 404.1527(a)(1) and § 416.927(a)(2). The ALJ also noted, however, that GAF scores are of limited use in assessing the severity and limiting effects of a claimant's mental impairments because the scale was developed for use in treatment and educational settings and was not intended to assess an individual's ability to work. (Tr. 31). In addition, the ALJ rejected plaintiff's GAF scores because they were unsupported by the treatment records or were assigned while plaintiff was noncompliant with his medication regime or had been drinking. (Tr. 31, 32). While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely consistent" with the medical and other evidence. (Tr. 33).

At step four, the ALJ concluded that plaintiff could not return to his past relevant work. Id. His age on the alleged onset date placed him in the "younger individual" category. He had a general education diploma and was able to communicate in English. Id. The transferability of job skills was not an issue because plaintiff's past relevant work was unskilled. The ALJ found at step five that someone with plaintiff's age, education, work experience, and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as a cutter/paster, an information clerk, and charge account clerk. (Tr. 34). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act

from April 6, 2014, the alleged onset date, through November 28, 2016, the date of the decision. <u>Id.</u> The ALJ declined to address the materiality of plaintiff's substance abuse because his combination of impairments was not disabling.

## V. <u>Discussion</u>

Plaintiff argues that the ALJ improperly concluded that plaintiff did not meet the requirements of Listing 11.14 and improperly addressed his alcohol abuse. In addition, he argues that the Appeals Council failed to consider the evidence of his psychiatric hospitalization in November 2016.

### A. <u>Listing 11.14</u>

As relevant to plaintiff's claim, Listing 11.14 applies where a claimant has peripheral neuropathies characterized by "[d]isorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities."[10] 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 11.14 (internal citations omitted). "Extreme limitation" is defined as "the inability to stand up from a seated position, maintain balance in a standing position and while walking, or use your upper extremities to independently initiate, sustain, and complete work-related activities." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 11.00 § D.2. "Inability to stand up from a seated position" is defined as being "unable to stand and maintain an upright position without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes." <u>Id.</u> Similarly, "inability to maintain balance in a standing position" is the inability "to maintain

---

[10] The Listing may also be satisfied by "marked limitation" (1) in physical functioning and (2) in one of the following: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. <u>Id.</u>

an upright position while standing or walking without the assistance of another person or an assistive device, such as a walker, two crutches, or two canes." Id.

Dr. Naseer observed that plaintiff walked "rather slowly," had difficulties getting on and off the examination table and standing on his heels and toes, could not walk in tandem, and had "strongly positive" Romberg's sign. In addition, Dr. Naseer opined that plaintiff was unable to balance and should use a cane and avoid stairs, ramps, ladders. These limitations, however, are not sufficient to satisfy Listing 11.14, which requires plaintiff to present evidence that he has to use a walker, two crutches, or two canes to walk. The ALJ's determination that plaintiff did not meet the requirements of Listing 11.14 is supported by substantial evidence on the record.

**B.     Alcohol Abuse**

The ALJ determined that plaintiff had a serious medical impairment of alcohol abuse. Plaintiff argues that the ALJ failed to follow the required procedures for determining whether his alcohol drug abuse was a material factor contributing to his disability, as set forth in Brueggemann v. Barnhart, 348 F.3d 689 (8th Cir. 2003).

In 1996, Congress amended the Social Security Act to eliminate benefits for disabilities arising from addiction to alcohol or other drugs. See id. at 693 (discussing the 1996 Congressional amendment). The regulations implementing this law, 20 C.F.R. § 404.1535 (relating to applications for disability insurance) and 20 C.F.R. § 416.935 (relating to applications for supplemental security income), provide as follows:

> How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>
> (a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.

> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

>> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

>> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 404.1535.

"The plain text of the relevant regulation requires the ALJ first to determine whether [a claimant] is disabled." Brueggemann, 348 F.3d at 694. Only after the ALJ has made an initial determination (1) that a claimant is disabled, (2) that drug or alcohol use is a concern, and (3) that substantial evidence on the record shows what limitations would remain in the absence of alcoholism or drug addiction, may the ALJ reach a conclusion on whether the claimant's substance use disorders are a contributing factor material to the determination of disability. Id. at 695. It is the claimant's burden to prove that alcoholism is "not a contributing factor material to the disability determination," while the ALJ "retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding." Id. at 693.

Plaintiff alleges that the ALJ erred during the first step of this analysis—determining whether a claimant is disabled. Brueggemann makes clear that the ALJ must consider the claimant's medical limitations "without deductions for the assumed effects of substance use disorders. The inquiry here concerns strictly symptoms, not causes . . ." Id. at 694. The ALJ must not "segregate[e] out any effects that might be due to substance use disorders." Id. Here, as in Brueggemann, the ALJ did not cite the applicable regulations, nor is it clear that the failure to do so is merely a drafting oversight. See id. (failure to cite regulation reflected failure to follow required procedure). Plaintiff argues that, in determining plaintiff's RFC, the ALJ improperly discounted his symptoms based on his alcohol abuse. Thus, the ALJ stated that the low GAF scores assigned to plaintiff "were given at a time when he was actively using alcohol in excess and thus . . . do not reflect his functioning without alcohol."[11] (Tr. at 26). More specifically, the ALJ discounted Dr. Goldmeier's assessment in January 2015 that plaintiff's GAF was 42 to 44, noting that the GAF was assigned while plaintiff was drinking. Id. at 32. Similarly, the ALJ noted that mental health professionals generally dissuade patients from drinking while taking psychiatric medications and that plaintiff's noncompliance with this advice undermines any assertion that he explored all opportunities to fully treat his mental impairments. Id. This process of considering the presumed effects of plaintiff's alcohol abuse in determining his RFC is a violation of the procedures set forth in Brueggemann. See Ingle v. Berryhill, No. 1:16-CV-00053-SPM, 2017 WL 4280672, at *6 (E.D. Mo. Sept. 27, 2017) (when making RFC determination, ALJ erred in RFC determination by failing to conduct analysis set forth in

_____

[11] The Court notes that plaintiff was never assigned a GAF score above 50, even in times when he apparently was not using alcohol. See, e.g., Tr. 413-15 (Jan. 29, 2015 GAF score was 42, with one beer day before and last use one week before); 403-07 (Aug. 18, 2015 GAF score was 42, with last use three weeks earlier).

Brueggemann and the regulations and discounting plaintiff's symptoms due to substance use);

Patterson v. Colvin, No. 2:15 CV 75 JMB, 2016 WL 7242157, at *8 (E.D. Mo. Dec. 15, 2016)

(noting that ALJ erred in performing "a collapsed and truncated analysis" and considering

plaintiff's alcohol dependence in connection with the determination of the RFC); Bryant v.

Colvin, No. 4:11CV00914 JLH, 2013 WL 3580641, at *5 (E.D. Ark. July 11, 2013) (remanding

for further proceedings where ALJ "seem[ed] to segregate out the effects of [plaintiff's]

substance abuse disorders and then conclude, with those effects deducted, that plaintiff lacked

the requisite physical or mental impairment."); Tapp v. Barnhart, No. C01-3061-MWB, 2002

WL 31295333, at *23 (N.D. Iowa May 16, 2002) (stating that the "ALJ made an ultimate finding

that [plaintiff] was not disabled . . . but appears to have done so only by taking into account

[plaintiff's] alcoholism. This puts the cart before the horse, as the first determination must be

whether [plaintiff] is disabled as he presented himself, without "deducting out alcohol" in

making this determination."); Parker v. Colvin, No. 4:10CV2263 HEA, 2013 WL 1873770, at *5

(E.D. Mo. May 3, 2013) (ALJ erred by determining that plaintiff's diagnoses of bipolar disorder,

schizophrenia and an antisocial personality disorder "are not severe during periods when the

claimant is not using drugs or alcohol.")

Here, plaintiff has been diagnosed with severe, recurrent, chronic major depressive

disorder and an anxiety disorder, has had frequent interventions for suicidal ideation, including

brief inpatient hospitalizations, and has been prescribed medication to address his psychiatric

symptoms. As noted, mental health professionals routinely assigned plaintiff GAF scores

indicating, at best, serious impairment. The Court further notes that the only formal assessment

of the effect of plaintiff's mental impairments on his ability to work is Dr. DeVore's assessment

in July 2014 which, as the ALJ noted, was not based on an examination of plaintiff and did not include evaluation of subsequent records indicating that plaintiff had severe mental impairments. The Court finds that the ALJ's decision to discount the GAF scores in part because they were assigned while plaintiff was drinking does not comply with the <u>Brueggemann</u> procedure. For the reasons stated above, the Court cannot state that the failure to follow the procedure was harmless error. Accordingly, this matter will be remanded for further proceedings.

### C. <u>Evidence Submitted to the Appeals Council</u>

Plaintiff was admitted for inpatient treatment of suicidal ideation on November 2, 2016. The ALJ did not receive the medical records from this event before issuing the decision on November 28, 2016, but plaintiff contends, and defendant does not dispute, that they were submitted to the Appeals Council while the matter was pending there. The Appeals Council did not refer to the exhibits when it denied review.

"Under [20 C.F.R. § 404.970(b)], if a claimant files additional medical evidence with a request for review prior to the date of the [Commissioner's] final decision, the Appeals Council MUST consider the additional evidence if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." <u>Whitney v. Astrue</u>, 668 F.3d 1004, 1006 (8th Cir. 2012) (emphasis in original) (quoting <u>Williams v. Sullivan</u>, 905 F.2d 214, 216 (8th Cir. 1990)). The Appeals Council's failure to consider the evidence "may be a basis for remand by a reviewing court." <u>Id.</u> (quoting <u>Box v. Shalala</u>, 52 F.3d 168, 171 (8th Cir. 1995)). Because this matter will be remanded for further consideration of plaintiff's claim under <u>Brueggemann</u>, the ALJ will have the opportunity to address the November 2016 medical records.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.


*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of October, 2018.